

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 06 CR 385 |
| v. ) | |
| ) | Judge John W. Darrah |
| RAFAEL PARRILLA ) | |

## MEMORANDUM OPINION AND ORDER

On November 29, 2006, pursuant to a written plea agreement, Defendant, Rafael Parrilla, pled guilty to one count of conspiracy to possess with intent to distribute and to distribute in excess of 50 grams of mixtures and substances containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846. Presently before this Court is the Government's Motion to Vacate Defendant Parrilla's Plea of Guilty and to Declare His Plea Agreement Null and Void.

### BACKGROUND

*October 25, 2006: First Proffer Session*

On October 25, 2006, Defendant and his attorney participated in a proffer session with the Government. Defendant provided the following information: In or about April 2006, Defendant, Alma Matias ("Matias"), and Jewel Punzalan ("Punzalan") drove from Chicago to Las Vegas and, while in Las Vegas, stayed with Bert Espina ("Espina"). In Las Vegas, Matias purchased methamphetamine from Espina; Defendant, Matias, Punzalan, and others smoked it. Defendant, Matias, and Espina also discussed Espina's supplying Defendant and Matias with methamphetamine in the future. According to Defendant, Espina also told Defendant that he could supply methamphetamine at a price of $700 per ounce and that Espina was already supplying another individual in Chicago.

After a few days in Las Vegas, Espina was unable to supply Defendant, Matias, and Punzalan with a large amount of methamphetamine; at which point, Defendant suggested they travel to Los Angeles, California, to contact someone Defendant knew to be a supplier. Defendant, Matias, Punzalan, and Espina's roommate, Nomar Fidel Castro ("Nomar"), drove to Los Angeles. According to Defendant, Nomar also had a methamphetamine supplier in California. When questioned as to Nomar's role in the conspiracy, Defendant informed the Government that Nomar distributed methamphetamine for Espina. Both Defendant and Nomar were unsuccessful in contacting their suppliers in Los Angeles, so the group drove back to Las Vegas without purchasing any methamphetamine. Matias eventually purchased methamphetamine from someone other than Espina or Nomar while in Las Vegas. Defendant purchased an eighth of an ounce of that methamphetamine before returning to Chicago.

Once back in Chicago, in or about May 2006, Matias purchased one ounce of methamphetamine from Espina. Defendant suggested that Matias have Espina send the package to his girlfriend's aunt's home. Once the package was received, Defendant purchased ten grams of the methamphetamine from Matias. Later that month, Matias received three ounces of methamphetamine from Espina, of which Defendant purchased one ounce. On or about May 24, 2006, another package containing methamphetamine was sent from Las Vegas to Matias in Chicago. Defendant aided Matias in tracking the package and was supposed to sell a portion of the methamphetamine once the package arrived.

*November 2, 2006: Grand Jury Testimony, Plea Agreement, and Plea Colloquy*

On November 2, 2006, Defendant testified before a grand jury and gave information consistent with his October 25 proffer. *See Gov't's Attachment B*. Defendant also repeated the same version of events in his plea agreement and during a plea colloquy. *See Gov't's Attachment A*.

*February 23, 2007: Second Proffer Session*

Based in part on the information provided by Defendant, Espina was charged by criminal complaint in December of 2006. After charging Espina, the Government received fingerprint analysis results of the May 24th package shipped to Matias. The analysis concluded that the only fingerprints on the package belonged to Nomar.

After receiving the fingerprint analysis, the Government again interviewed Defendant on February 23, 2007. During this interview, Defendant provided additional information with regard to his knowledge of Nomar's involvement in methamphetamine trafficking and a modified version of events related to his trip to Las Vegas. Defendant stated that upon arriving at Espina's home in Las Vegas, everyone present smoke methamphetamine, though Defendant was unaware who supplied it. Defendant also stated that both Espina and Nomar were having trouble finding suppliers, so they eventually traveled to California on the unsuccessful trip to find a supplier.

Defendant also informed the Government that while in Las Vegas, Nomar called one of his suppliers and arranged for the supplier to meet him, Defendant, Matias, and Punzalan. During the meeting, Nomar obtained seven grams of methamphetamine, of which he gave three-and-a-half grams to Defendant. At another point, Nomar arranged to take Defendant and Matias to another supplier's home, where Matias purchased a small amount of methamphetamine, which they all smoked. Nomar introduced the supplier to Matias as someone who could potentially provide Matias

with a steady supply of methamphetamine. The following day, Nomar and Matias returned to the same home; and Matias purchased eight ounces of methamphetamine. Matias later showed Defendant the methamphetamine she had purchased.

During the interview, Defendant also stated his belief that the package containing methamphetamine received by Matias on May 24, 2006 was not sent from Espina but was in fact sent from Nomar. According to Defendant, that belief was based on the fact that Nomar, rather than Espina, was able to purchase methamphetamine while Defendant was in Las Vegas. Defendant also overheard Matias' speaking with Nomar on the phone regarding the May 24th package. After Matias was arrested for receiving the May 24th package, Defendant attempted to contact Nomar, leaving several messages, in an attempt to determine what had happened.

*April 24, 2007: Third Proffer Session*

On April 24, 2007, Defendant provided additional information, which was inconsistent with his grand jury testimony. Defendant stated that he never discussed with Espina the potential for Espina to supply methamphetamine to both himself and Matias in the future; that he never heard Matias and Espina discussing such an arrangement, as he had testified before the grand jury. Defendant stated further that upon returning to Chicago from Las Vegas, Defendant requested that Matias provide him with methamphetamine at the same price she was paying "someone" in Las Vegas for it. Defendant also stated that he was unaware of whom from Las Vegas supplied Matias with the methamphetamine he received from her. Finally, Defendant stated his belief that Nomar sent the May 24th package was based not on Nomar's ability to purchase methamphetamine in Las Vegas but on Defendant's witnessing an increase in the number of communications between Matias and Nomar around the time the package was received.

4

*July 26, 2007: Fourth Proffer Session*

On July 26, 2007, the Government met with Defendant in order to discuss the inconsistencies in his previous proffers and grand jury testimony. Though Defendant's attorney ended the meeting before discussion of many of the inconsistencies, Defendant did admit his statement with regard to the purchase of one eighth of an ounce of methamphetamine from Espina was untrue.

Subsequently, the Government dismissed the charges against Espina and informed Defendant's counsel that by providing false information and making material omissions, Defendant had breached the cooperation provision outlined in the plea agreement discussed below. The Government, therefore, informed Defendant of its intention to file the instant motion in order to revoke Defendant's plea agreement on the basis of material breach.

On March 26, 2008, this Court held an evidentiary hearing to determine whether Defendant had in fact breached the plea agreement.

## ANALYSIS

The Seventh Circuit has "long recognized that a plea agreement is a contract . . . ." *U.S. v. Ataya*, 864 F.2d 1324, 1329 (7th Cir. 1988) (*Ataya*). "The question of a defendant's breach is not an issue to be determined unilaterally by the government. *Ataya*, 864 F.2d at 1329-30. Defendants are entitled to an evidentiary hearing to determine if a breach has occurred. *U.S. v. Kelly*, 337 F.3d 897, 901 (7th Cir. 2003) (*Kelly*), citing *Ataya*, 864 F.2d at 1330. Before nullifying a plea agreement, there must be a determination that there has been a "substantial breach" of the agreement, "'in light of the parties' reasonable expectations' upon entering the agreement." *Ataya*, 864 F.2d at 1330, quoting *U.S. v. Fields*, 766 F.2d 1161, 1168 (7th Cir. 1985). The standard used to assess the reasonable expectations of the parties is an objective one. *Kelly*, 337 F.3d at 902. The government

5

is only required to prove a substantial breach by a preponderance of the evidence; and "[i]n general, a defendant's substantial breach of an unambiguous term frees the government to rescind the deal." *Kelly*, 337 F.3d at 901.

The plea agreement in question requires that Defendant "fully and truthfully cooperate with the government in any matter . . . [and that he] agrees to provide complete and truthful information . . . ." *Gov't's Attachment A*, ¶ 18. The agreement further provides that "failure to abide by any term of the Plea Agreement is a violation of the Agreement[]" and that such a violation allows the Government to move to vacate, rendering the agreement null and void. *Gov't's Attachment A*, ¶ 21.

Throughout his proffers and grand jury testimony, Defendant continued to make inconsistent statements regarding the methamphetamine trafficking and conspiracy in question. Specifically, Defendant repeatedly testified to the grand jury that Espina had supplied Matias with the May 24th package, though he believed Nomar to be the supplier. Defendant had opportunities to correct any misunderstanding prior to giving his grand jury testimony, though he failed to do so. The intention of the plea agreement required the Defendant to provide complete and accurate information. By failing to correct any inconsistencies prior to testifying and failing to provide the Government with all the information and beliefs Defendant had, Defendant failed to fulfill his responsibilities under the agreement. As a result, the Government was forced to drop any charges against Espina, whose prosecution was the basis for Defendant's cooperation and plea agreement.

Both parties reasonably expected the agreement to facilitate Defendant's cooperation in providing complete and accurate information with regard to the methamphetamine trafficking in question and Espina's role therein. Defendant was afforded an opportunity but failed to present

evidence during the hearing regarding this issue; it is clear that the Government has met its burden, proving Defendant's substantial breach by a preponderance of the evidence. Defendant failed to cooperate fully and truthfully and, therefore, substantially breached the plea agreement. Accordingly, upon the Government's motion, the agreement may be rendered null and void.

## CONCLUSION

For the foregoing reasons, the Government's Motion to Vacate Defendant Parrilla's Plea of Guilty and to Declare His Plea Agreement Null and Void is granted. The Plea Agreement is declared null and void, and Defendant's plea of guilty to Count One is vacated.

Dated: April 8, 2008

JOHN W. DARRAH
United States District Court Judge